IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ANDREW ETLING,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 15-cv-598-CJP**[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Andrew Etling, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Mr. Etling applied for benefits in November 2011, alleging disability beginning on August 1, 2000.  After holding an evidentiary hearing, ALJ Stephen M. Hanekamp denied the application on December 20, 2013.  (Tr. 18-28).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision subject to judicial review.  (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 16.

<u>**Issues Raised by Plaintiff**</u>

Plaintiff raises the following points:

1.   The ALJ erred in evaluating plaintiff's mental residual functional capacity (RFC) in that he gave "great weight" to the opinion of state agency reviewer Howard Tin, Psy.D., but failed to include all limitations found by Dr. Tin in his RFC assessment.

2.   The ALJ impermissibly "played doctor" in considering the medications taken by plaintiff.

<u>**Applicable Legal Standards**</u>

To qualify for SSI benefits, a claimant must be disabled within the meaning of the applicable statutes.   In this context, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).[2]

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Etling was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However,

while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hanekamp followed the five-step analytical framework described above. He determined that Mr. Etling had not been engaged in substantial gainful activity since the date of his application.

The ALJ found that plaintiff had one severe impairment, depression.   He further determined that this impairment does not meet or equal a listed impairment.

The ALJ found that Mr. Etling had the residual functional capacity (RFC) to perform work at all exertional levels, limited to simple, routine tasks that:

- Involve no more than one or two changes in work duties or settings per shift;

- Can be performed independently;

- Involve working primarily with things, not people;

- Involve only superficial interaction with co-workers and supervisors;

- Involve no direct interaction with the general public; and

- That are in non-public settings.

Based upon the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because he was able to do jobs that exist in significant numbers in the regional and national economies.   Such jobs include material mover, hand packer, and janitorial work.

Page **5** of **22**

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1.    **Agency Forms**

The alleged onset date of August 1, 2000, was plaintiff's 18th birthday.    (Tr. 129).   In a Disability Report filed in November 2011, plaintiff stated that he was unable to work because of depression, anxiety and obsessive compulsive disorder. He was 5'11" tall and weighed 185 pounds.   (Tr. 133).

Plaintiff graduated from high school in 2000.   He had worked as a busboy/dishwasher from September 1998 to August 1999, and as a grounds keeper/grass cutter for a municipality from June to September 2001.   (Tr. 133-134).   Plaintiff earned about $685 in 1998, about $2172 in 1999, and about $1823 in 2001.   (Tr. 127).

Plaintiff submitted a Function Report in December 2011 in which he alleged that he suffered from "marked limitations in concentration/persistence/and pace, marked limitations in social interaction, inability to be punctual and conform to normal work breaks within customary tolerances, inability to work around others without being distracted by them, [and] inability to react predictably and deal with normal work stressors."   (Tr. 145).   He said he usually woke up at 3:00 p.m. and watched television.   He was unable to fall asleep at night and had a "very irregular sleep pattern."   He wore the same clothes for 3 days and showered every other day.

He lived with his parents.   He took out the trash when they told him to.   He said that he had trouble with memory, completing tasks, concentration, understanding, following instructions, and getting along with other people.   He was not taking any medications.   He said that his doctors had tried many medications without success.   (Tr. 146-152).

Plaintiff's mother submitted a report stating that plaintiff does not interact with others and has anxiety and stress when not in familiar surroundings.   He watched TV, listened to music and played video games.   He had poor concentration, understanding and focusing.   He obsessed about technology, time and how old he is.   He had no success with any medications and they caused him many side effects.   (Tr. 154-164).

### 2.   Evidentiary Hearing

Mr. Etling was represented by an attorney at the evidentiary hearing on May 31, 2013.   (Tr. 33).   Plaintiff's parents, Norman and Deborah Etling, also attended the hearing.   (Tr. 36).

Plaintiff lived with his parents.   His only work had been a part time job in a restaurant for 11 months and a part-time job for the Village of Shiloh that lasted for 3 months.   He was not looking for work.   On a typical day, he watched TV and maybe made a sandwich.   He hung out with friends about twice a month.   He was not taking any medications because he had "tried a bunch of them and none of them really work."   He was going to counselling.   (Tr. 39-42).   He left the jobs that he had in the past because "they were too overwhelming."   (Tr. 47).

He had only a few minutes of contact with his parents on a typical day.   He

did not eat lunch or dinner with them.   He mowed the lawn when his parents told him to.   (Tr. 44-46).   He did not know what he wanted to do with his life.   (Tr. 49).

Plaintiff's father testified that they had been to numerous counselors and psychiatrists and had tried everything that had been suggested, but nothing worked.   He testified that his son was "always by himself" and described him as a "lost soul."   (Tr. 53-54).

Plaintiff's mother testified that they first noticed Andrew having depressive symptoms when he was in high school.   They started taking him to counselors and doctors when he was 17.   He had tried many different medications.   She said that Andrew had tried everything that the counselors and doctors suggested and nothing helped.   (Tr. 55-57).

A vocational expert also testified.   The ALJ asked her a hypothetical question that corresponded to the ultimate RFC findings.   The VE testified that this person could do jobs that exist in significant numbers in the national and regional economies.   Examples of such jobs are material mover, hand packer, and janitorial jobs.   These jobs are all unskilled.   (Tr. 59-61).

The VE testified that a worker in an unskilled job could be off-task for perhaps 10% of the day, depending on work flow, and still do the job.   (Tr. 61).

### 3.   Medical Records

Mr. Etling was seen at the I Think I Can Learning Center in Fairview Heights, Illinois, from March to July 2002.   The signature of the healthcare provider or counselor is not legible and there is no indication of that person's profession.   A

typewritten sheet indicates that Andrew would be seen for individual counseling with "Charlie" and would see Dr. Hall-Davis for medication management.  (Tr. 549).   A Parent Questionnaire states that plaintiff had previously seen Lori Lehr, Dr. Judy Keevan and Bryan Loy.   They had been referred to I Think I Can by St. Elizabeth's Hospital.   (Tr. 556).

The first note indicates that Mr. Etling had been previously diagnosed with bipolar disorder.  (Tr. 547).   He was seen for counselling sessions at I Think I Can on 18 visits from March 27, 2002, through July 24, 2002.   In April, he was prescribed medication by "Dr. Jackie" and he agreed to take it.   On May 29, he reported that he had stopped taking the medication because it made no difference. At all sessions, he reported that he stayed up almost all night and slept almost all day.   He was not looking for work.   At the last visit, plaintiff said he was willing to try taking Paxil.   He had registered for fall classes at a community college.  (Tr. 529-547).

The next record is dated January 2010.   Plaintiff was seen in the emergency room at St. Elizabeth's Hospital.   He was brought in by his parents.   He had a history of bipolar disorder and dependent personality disorder.   He had "behavioral outbursts" at home and was destroying his room.   He was argumentative and had punched the wall.   He had been taking Abilify, but had recently stopped.   He denied hearing voices.   He denied hallucinations.   He eventually agreed that he would take medications, but not Abilify.   The discharge diagnosis was "untreated bipolar."   (458-472).

Plaintiff attended counselling sessions at St. Elizabeth's beginning in

February 2010.   At the initial evaluation, on February 1, 2010, plaintiff told Michael Krim, Ph.D., that he had been depressed all of his life, but it had gotten worse in the last few months.   In November of the prior year he had "bottomed out" He had been put on medication that created more side effects.   He felt angry and that his life was not going like he would like it to.   He was frustrated and lacked motivation.   He was unemployed and had little desire to work.   The initial diagnosis was dysthymic disorder, rule out major depressive disorder and rule out bipolar disorder.   (Tr. 305-306).   On February 3, 2010, an advanced practice nurse noted that plaintiff's mother reported that, when he got home from the previous session, he started "ranting and raving" and talking to himself.   The nurse consulted with a doctor who recommended that he discontinue Paxil and start on Seroquel.   (Tr. 316).   On February 2, 2010, the APN noted that he was doing better.   He was attending daily sessions.   She noted that he had increased psychomotor activity.   He would lick his finger and then rub his eyelashes.   His Seroquel was decreased and he was to take 20 mg. of Paxil daily.   (Tr. 317).   He attended counselling sessions through March 5, 2010.   The discharge summary indicates a diagnosis of dysthymia and anxiety, not otherwise specified.   He was isolating less, sleeping better and thinking more positively.   (Tr. 341).

At some point, plaintiff began seeing Dr. Jeffrey Chalfant at Psychiatric Services of Southern Illinois.   The earliest office note is dated July 29, 2010.   It is not clear whether this was the first visit with Dr. Chalfant.   Mr. Etling was 27 years old.   He was seen with his mother "for psychiatric consultation."   Plaintiff was already taking Seroquel.   He reported that Seroquel made him tired so he did not

always take it.   His mother reported that plaintiff "was still obsessing about different things" and sleeping a lot.   There was trash all over his room.   Dr. Chalfant discontinued Seroquel and prescribed Risperdal.   He noted that "psych testing" was pending.   Dr. Chalfant also noted "need my records from sips."   (Tr. 248-249).   On August 18, 2010, Dr. Chalfant noted that plaintiff yelled at his mother every day.   He was to have psychological testing the next week.   (Tr. 251). On September 13, 2010, Dr. Chalfant said he reviewed "the report from Dr. Lotz which confirmed previous psychiatric diagnosis of major depressive disorder with psychotic features."   However, there is no report from a Dr. Lotz in the transcript. Since the last appointment he had cut his hair and was not yelling at his mother. She felt less threatened.   Dr. Chalfant recommended starting Wellbutrin.   (Tr. 254).

Dr. Chalfant saw Mr. Etling a total of 10 times.   He had 5 visits from July to October 2010 (Tr. 248-259); 1 visit in October 2011 (Tr. 261); 3 visits in March and April 2012 (Tr. 263-267, 476); and 1 visit on April 25, 2013 (Tr. 518).   Plaintiff was accompanied by his mother or by both parents on all visits.   Dr. Chalfant's diagnosis on the last visit was major depressive disorder, recurrent, severe, without psychotic behavior.   (Tr. 519).

Over the course of treatment, Dr. Chalfant prescribed a number of medications, but plaintiff refused to take them for any length of time because of side effects.   He prescribed, in turn, Risperdal (Tr. 248), Wellbutrin (Tr. 254), and Pristiq (Tr. 257).   Dr. Chalfant also talked to plaintiff about ECT (electroconvulsive therapy) in September 2010, but plaintiff did not want it.   (Tr. 257).   On October

13, 2010, Dr. Chalfant told plaintiff that there was no need for the doctor to see him if he was not going to take the prescribed medications.   (Tr. 259).

Plaintiff did not return to Dr. Chalfant until a year later, on October 11, 2011, when plaintiff indicated that he was willing to try medication again.   There is no indication that he was treated by any other mental healthcare provider in the interim.   Dr. Chalfant prescribed Clonazepam.   Plaintiff was to return in 1 month. (Tr. 261).   However, the next office note from Dr. Chalfant is dated March 14, 2012.   Plaintiff reported that he was depressed.   Plaintiff did not know "how he wants to treat the depression," but he agreed to try Viibryd.   He was to return in 2 weeks with a plan on how he wanted to treat his depression, i.e., using medication, therapy or ECT.   (Tr. 264).   On March 29, 2012, plaintiff was still taking Viibryd. (Tr. 266).   However, on April 26, 2012, plaintiff reported that he had stopped taking his medication and did not want ECT or counselling.   Both of plaintiff's parents accompanied him on this visit.   Dr. Chalfant gave him Dr. Sky's number for a second opinion.   (Tr. 476).   There is no indication that plaintiff consulted Dr. Sky.

Dr. Chalfant's last note is dated April 25, 2013.   Plaintiff's father and mother attended the appointment with him, and said he was about the same.   His father said he had been "more reclusive."   Plaintiff again said he did not want ECT or medication.   He was to continue to see his counselor Patricia.   (Tr. 518-519).

Mr. Etling saw counselor Patricia Mosbacher at Psychiatric Services of Southern Illinois from May 8, 2012, to April 9, 2013.   (Tr. 477-516).   He attended a total of 20 counselling sessions.   On the first visit, he told her that he had been

depressed for 11years and had not "felt right since he was 14 years old." Her assessment was that he suffered from major depressive disorder, severe. He said he did not like medication, so he was not taking any antidepressants. He said he wanted to get better, but was only coming to therapy because he was given a choice between medication, ECT, or therapy. He did not "trust the treatment process" or believe that it would help him. (Tr. 477-478). On the last visit, in April 2013, Ms. Mosbacher noted that plaintiff was difficult to engage in conversation. He said that he did not "see the point of working because it never ends." She noted that he had no psychosis and was not suicidal. His flow of thought was logical and sequential. His mood was dysthymic. (Tr. 515).

### 4.   Consultative Psychological Exam

Harry J. Deppe, Ph.D., performed a consultative psychological exam on January 26, 2012. Mr. Etling said that he had seen a psychiatrist about 5 or 6 months earlier because he was depressed, but that he was not currently being treated and was not taking any medication. He said that his appetite and sleep were fine. On exam, his mood and affect were unremarkable. He had no formal thought disorders. His responses to questions were coherent and relevant. Dr. Deppe concluded that plaintiff's abilities to relate to others, to understand and follow simple instructions, and to maintain attention to perform simple repetitive tasks were intact. He had good ability to withstand the stress of day-to-day work. Dr. Deppe diagnosed adjustment disorder, with depressed mood, in remission. (Tr. 226-229).

### 5.   State Agency Consultant's RFC Assessment

On February 3, 2012, Howard Tin, Psy.D., assessed plaintiff's mental RFC. He used an agency form (Form SSA-4734-F4-SUP) that is commonly used for this purpose in social security cases.   (Tr. 230-233).   This form is referred to as the Mental Residual Functional Capacity Assessment.   Section I of the form consists of a list of mental activities.   The consultant is asked to set forth his "summary conclusions" by checking a box to rate the severity of limitation as to each activity. The levels of severity are (1) not significantly limited, (2) moderately limited, (3) markedly limited, (4) no evidence of limitation in this category, and (5) not ratable on available evidence.

Dr. Tin checked the box for "moderately limited" for the following activities:

- Ability to maintain attention and concentration for extended periods;

- Ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- Ability to work in coordination with or proximity to others without being distracted by them;

- Ability to interact appropriately with the general public;

- Ability to get along with coworkers without distracting them or exhibiting behavioral extremes;

- Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

He checked the box for "not significantly limited" for ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to carry out very short and simple instructions.   All other categories were rated as either "not significantly limited" or "no evidence of limitation."

In Section III of the form, the consultant is directed to explain his "summary

conclusions in narrative form.   Include any information which clarifies limitation or function."   Here, Dr. Tin wrote, in part, "Claimant can remember locations or work-like procedures and can also understand and remember short simple instructions although the individual has difficulty remembering detailed instructions….Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks."   (Tr. 232).

## Analysis

The Court agrees with plaintiff's first point.   Citing *O'Connor–Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), plaintiff correctly argues that a limitation to simple, routine tasks does not adequately account for a moderate limitation in maintaining concentration, persistence or pace.

The ALJ gave "great weight" to Dr. Tin's opinion.   He did not say that he disagreed with any part of it.   (Tr. 25).   He found at step three that plaintiff had "moderate difficulties" with concentration.   (Tr. 21).

The Commissioner argues first that the ALJ was not required to include the moderate limitations indicated by Dr. Tin's checkmarks in Section I of the MRFC form.   She argues that the ALJ was entitled to ignore these worksheet observations in favor of the "narrative RFC" set out in Section III of the form.   This argument is contrary to Seventh Circuit precedent and also ignores the fact that the ALJ made a finding that plaintiff had a moderate limitation in maintaining concentration.

In making this argument, the Commissioner relies on *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015).   In *Varga*, the state agency consultant checked the box to

indicate that the plaintiff had moderate limitations in concentration, persistence or pace in Section I of the MRFC form.   In Section III, he wrote "see EWS," referring to an electronic work sheet which was lost by the agency.   The Commissioner hones in on this aspect of the opinion, selectively citing to part of the final paragraph of the opinion.   Her brief suggests that *Varga* holds that an ALJ must account for the Section I findings only where "no narrative translation exists."   See, Doc. 18, p. 11.

The Commissioner's reading of *Varga* is erroneously narrow.   The full final paragraph of the opinion reads as follows:

> Worksheet observations, while perhaps less useful to an ALJ than a doctor's narrative RFC assessment, are nonetheless medical evidence which cannot just be ignored. True, in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations. See *Johansen*, 314 F.3d at 286. But where, as here, no narrative translation exists—because of error on the part of the doctor or the agency—an ALJ's hypothetical question to the VE must take into account any moderate difficulties in mental functioning found in Section I of the MRFCA form, including those related to concentration, persistence, or pace.

*Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015).

The Commissioner's argument here glosses over the Seventh Circuit's clear statement that the so-called worksheet observations constitute medical evidence that cannot simply be ignored.   Further, she pays insufficient attention to the Seventh Circuit's admonition that the ALJ can rely on the narrative statement in Part III only where it "adequately encapsulates and translates" the worksheet observations.   In effect, she is arguing that Dr. Tin "translated" his worksheet finding of a moderate limitation in maintaining concentration, persistence or pace into a narrative assessment by stating that plaintiff is limited to performing simple

tasks.   Again, this position has repeatedly been rejected by the Seventh Circuit. *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 858 (7th Cir. 2014); *O'Connor-Spinner*, 627 F.3d at 620, and cases cited therein.

The Commissioner attempts to get around these precedents based on an analysis of the agency's explanation of the meaning of the checkboxes in Section I of the Mental RFC Assessment Form.   She points out that the agency's POMS (Program Operations Manual System) explains that "moderately limited" means that "the individual's capacity to perform the activity is impaired," while "markedly limited" means that "the individual cannot usefully perform or sustain the activity." Therefore, according to defendant, Dr. Tin's opinion that plaintiff had moderate limitations means only that there was some limitation, "no matter how small," and the ALJ is justified in relying on the narrative explanation rather than on the "unexplained checkboxes."   See, Doc. 18, pp. 7-8.

Defendant's argument is not persuasive.   First, it flies in the face of the holdings of *Varga* and *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), cited in *Varga*. The argument is simply a modified version of the argument the Commissioner made in *Varga*, i.e. that Section I of the form is merely a worksheet.   She cited *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 637 (3d Cir. 2010), in *Varga*, and she relies on that case here as well.   However, the Seventh Circuit declined to follow *Smith*: "This circuit has declined to adopt a blanket rule that checked boxes in Section I of the MRFCA form indicating moderate difficulties in mental functioning need not be incorporated into a hypothetical to the VE."   *Varga*, 794 F.3d at 816.

Secondly, the Commissioner's argument based on the definitions given in

POMS ignores the fact that there are other choices available in Section I of the Mental RFC Assessment Form.   The consultant can also check "not significantly limited" or "no evidence of limitation in this category."   Thus, "moderately limited" cannot mean, as defendant argues, some limitation "no matter how small." Rather, it must mean something more than "not significantly limited," which, in turn, must mean something more than "no evidence of limitation in this category." Defendant's related argument that a moderate limitation does not signify an insurmountable problem misses the point.   While a moderate limitation does not signify an insurmountable problem, a moderate limitation in concentration, persistence or pace must be presented to the VE for consideration.   *Varga,* 794 F.3d at 814; *Yurt,* 758 F.3d at 858; *O'Connor-Spinner*, 627 F.3d at 620, and cases cited therein.

The Commissioner also cites a nonprecedential case, *Capman v. Colvin*, 617 Fed.Appx. 575 (7th Cir. July 1, 2015).   If the citation is meant as a suggestion that *Capman* accepted the proposition that the ALJ can ignore the Section I observations because Section I is merely a worksheet, it is incorrect.   Consistent with the holdings in *Yurt* and *Varga* (which was decided about three weeks later), the Seventh Circuit held in *Capman* that "the ALJ may reasonably rely on the examiner's narrative in Section III, at least where it is not inconsistent with the findings in the Section I worksheet."   *Capman*, 617 F. App'x at 579.

Contrary to defendant's suggestion, this case is not like *Johansen* v. *Barnhart*, 314 F.3d 283 (7th Cir. 2002) or *Capman*.   In those cases, the state agency consultant set forth a narrative RFC in Section III which adequately

accounted for all of his Section I observations, and the ALJ incorporated the limitations referred to in Section III into his RFC assessment.   That did not happen here.

Dr. Tin's narrative statement in Section III actually conflicts with his Section I findings.   In Section I, he indicated that plaintiff was "not significantly limited" in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to carry out very short and simple instructions. However, in Section III, he said that "Claimant can remember locations or work-like procedures and can also understand and remember short simple instructions although the individual has difficulty remembering detailed instructions…. Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks."   (Tr. 232).   This blatant conflict, unremarked upon by either the ALJ or the Commissioner, calls into doubt the accuracy of Dr. Tin's entire narrative statement.   And, again, a limitation to simple tasks does not adequately account for a moderate limitation in concentration, persistence or pace. "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity."   *O'Connor-Spinner*, 627 F.3d at 620.

The Commissioner also argues that Dr. Tin's indication of a moderate limitation in sustaining concentration, persistence or pace "appears to be related" to plaintiff's limitation in working around others rather than "inherent concentration problems."   As the ALJ accounted for plaintiff's limitations in

working around others, the Commissioner argues that he adequately accounted for his concentration problem.   Doc. 18, p. 9.   This assertion is not based on anything that the ALJ said in his decision.   Rather, it arises out of the analysis of Dr. Deppe's report presented in the Commissioner's brief.

The ALJ nowhere stated that plaintiff's moderate limitation in concentration was related to his difficulty working with and around others, or that he believed that limiting plaintiff to working alone accommodated his concentration problems.   In advancing a reason not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine.   See, *SEC v. Chenery Corporation*, 318 U.S. 80 (1943).   "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."   *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012).   See also, *Hughes v. Astrue*, 705 F.3d 276, 279(7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine….."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision….").

Lastly, the Commissioner argues that the ALJ alerted the VE to plaintiff's concentration problems by asking her how often a person could be off-task and still perform the representative jobs.   The VE testified that it would depend on the work flow, but "perhaps 10 percent of the time."   (Tr. 61).   The problem with this argument is that the ALJ did not make a finding that plaintiff's moderate limitation in concentration would cause him to be off-task for 10 percent of the time.   The ALJ did not attempt to quantify plaintiff's limitation in concentration at all, and it is

not clear that he would have the expertise to do so in any event.   An ALJ may not make his own "independent medical findings."   *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996).

In short, ALJ Hanekamp erred in that, although he gave great weight to Dr. Tin's opinion and found at Step 3 that plaintiff was moderately limited in maintaining concentration, he did not include that limitation in either his RFC assessment or in a hypothetical question posed to the VE.   Under the binding precedents of *O'Connor-Spinner, Yurt* and *Varga*, this Court must conclude that the ALJ failed to build "an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC."   *Yurt,* 758 F.3d at 858-859.   Therefore, this case must be remanded.

The Court notes that much of the difficulty in this case and others like it stems from the wording of the agency's Mental RFC Assessment Form.   It would seem to be fairly simple for the agency to revise the form so that the consultant is asked to provide a more detailed opinion as to the exact nature and extent of the claimant's mental limitations.

Lastly, the Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Etling was disabled during the relevant period, or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Andrew Etling's application for

social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   June 16, 2016.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**